# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
US AIRLINE PILOTS ASSOCIATION, )
)
*Plaintiff,* )
)
v. )
)
PENSION BENEFIT GUARANTY )
CORPORATION, )
)
*Defendant.* )
_____)

Civil Action No. 1:09-cv-01675 (JR)

## PENSION BENEFIT GUARANTY CORPORATION'S
## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

*Office of the General Counsel*
Judith R. Starr, General Counsel
Phillip R. Hertz, Deputy General Counsel
Kenneth J. Cooper, Asst. General Counsel
Joseph J. Shelton, Special Counsel
Dharmesh S. Vashee, Attorney

*Office of the Chief Counsel*
Israel Goldowitz, Chief Counsel
Charles L. Finke, Deputy Chief Counsel
James J. Armbruster, Asst. Chief Counsel
Paula J. Connelly, Asst. Chief Counsel
Garth D. Wilson, Asst. Chief Counsel
Jean Marie Breen, Attorney
Joseph M. Krettek, Attorney
Michael A. Maricco, Attorney

PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, D.C.  20005-4026
Telephone: (202) 326-4020, ext. 6772
Facsimile: (202) 326-4112
krettek.joseph@pbgc.gov

September 11, 2009                    Attorneys for Defendant PBGC

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION. . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.     USAPA MEMBERS WILL NOT SUFFER IRREPARABLE HARM
           ABSENT THE INJUNCTION THEY SEEK. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    II.    USAPA HAS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS
           ON THE MERITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          A.    PBGC's actions have been thoroughly prudent and reasonable. . . . . . . . 12

          B.    USAPA has not shown that there is likely a meritorious claim against the
              former plan fiduciaries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          C.    USAPA has shown no harm to participants caused by PBGC's purported
              failure to pursue former plan fiduciaries. . . . . . . . . . . . . . . . . . . . . . . . . 22

          D.    PBGC's asserted inaction in pursuing an alleged fiduciary breach is
              presumptively unreviewable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    III.   THE BALANCE OF EQUITIES AND THE PUBLIC
           INTEREST FAVOR PBGC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

## <u>Cases Cited</u>

*Abdul Wali v. Coughlin,*
    754 F.2d 1015 (2d Cir. 1985)................................................ 10

*Adair v. England,*
    217 F. Supp. 2d 1 (D.D.C. 2002).......................................... 10

*Bancoult v. McNamara,*
    227 F. Supp. 2d 144 (D.D.C. 2002)...................................... 10

*Beck v. Levering,*
    947 F.2d 639 (2d Cir.1991)................................................. 26

*Boivin v. US Airways, Inc.,*
    No. 03-2373 (JR) (D.D.C. filed Nov. 17, 2003)..................... 7

*Boivin v. US Airways, Inc.,*
    297 F. Supp. 2d 110 (D.D.C. 2003)...................................... 7

*Boivin v. US Airways, Inc.,*
    2005 WL 713622 (D.D.C. Mar. 17, 2005),
    *vacated and remanded by*, 446 F.3d 148 (D.C. Cir. 2006). .................... 7

*Caskey v. PBGC,*
    No. 97-4240, 1999 U.S. DIST. LEXIS 21448 (E.D. Pa. Jan. 14, 1999),
    *aff'd mem.*, 203 F.3d 816 (3d Cir. 1999). .................................. 2

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006)............................................. 9

*Chao v. Malkani,*
    452 F.3d 290 (4th Cir. 2006)..................................... 11, 25, 26

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004)............................................. 9

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,*
    159 F.3d 636 (D.C. Cir. 1998)............................................ 10

*Davis v. PBGC,*
    No. 1:08-cv-01064 (JR) (filed June 28, 2008)................................... 8

*Davis v. PBGC,*
    596 F. Supp. 2d 1 (D.D.C. 2008),
    *aff'd*, 573 F.3d 1288 (D.C. Cir. 2009)
    *pet. for rehearing filed*, No. 08-5224 (D.C. Cir. Aug. 24, 2009).................... 8

*Davis v. PBGC,*
    571 F.3d 1288 (D.C. Cir. 2009).......................................... 24

*De Bruyne v. Equitable Life Assurance Sec.,*
    720 F. Supp. 1342 (N.D. Ill.1989),
    *aff'd*, 920 F.2d 457 (7th Cir. 1990). ....................................... 20

*Donovan v. Bierwirth,*
    680 F.2d 263 (2d Cir. 1982)................................................ 25

*Donovan v. Walton,*
    609 F. Supp. 1221 (S.D. Fla.1985),
    *aff'd sub nom*, 794 F.2d 586 (4th Cir. 1986). ................................. 20

*Elite Entm't, Inc. v. Reshammiya,*
    Case No. 08-0641,
    2008 U.S. Dist. LEXIS 31580 (D.D.C. Apr. 18, 2008)......................... 10

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.,*
    746 F.2d 816 (D.C. Cir. 1984).......................................... 10

*Heckler v. Chaney,*
    470 U.S. 821 (1985)................................................ 23, 24

*Katsaros v. Cody,*
    744 F.2d 270 (2d Cir. 1984)............................................ 26

*Marshall v. Snyder,*
    572 F.2d 894 (2d Cir. 1978)............................................ 26

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976). ......................................... 10

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)................................................... 9

*Mead Corp. v. Tilley,*
    490 U.S. 714 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Meghrig v. KFC Western, Inc.,*
    516 U.S. 479 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Metzler v. Graham,*
    112 F.3d 207 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*NTEU v. Yeutter,*
    918 F.2d 968 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Paulsen v. CNF Inc.,*
    559 F.3d 1061 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*PBGC v. Beverly,*
    404 F.3d 243 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*PBGC v. BankOne, N.A.,*
    34 F. Supp. 2d 608 (S.D. Ohio 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*PBGC v. Farley,*
    No. 08-cv-2529 (N.D. Ill. filed May 2, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*PBGC v. LTV Corp.,*
    496 U.S. 633 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Reich v. Lancaster,*
    55 F.3d 1034 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Sierra Club v. Johnson,*
    374 F. Supp. 2d 30 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Stanley v. Univ. of S. Cal.,*
    13 F.3d 1313 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Unisys Corp.,*
    173 F.3d 145 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## United States Code Cited

Title 5
    Section 552(b)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Title 11
    Section 704(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 704(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Title 29
Section 1109(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1301(a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1301(a)(18). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1301(a)(19). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1302.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1302(g)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1303(a)-(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1321.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3
Section 1322.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4
Section 1322(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1322(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1322(b)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1322(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1342.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1342(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1342(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1342(d)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1342(d)(1)(B)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1342(d)(1)(B)(iv). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1342(d)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16
Section 1344.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4
Section 1344(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
Section 1344(a)(1) - (2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1344(a)(1) - (6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
Section 1344(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1344(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 1344(a)(5) - (6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6
Section 1344(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 11
Section 1361.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3
Section 1362.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Section 1362(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

Section 1362(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 1363.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1364.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## Other Authorities Cited

29 C.F.R.

      4001.2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      4022.24-4022.25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      4044.10-16.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      4044.10(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      4044.11-17.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      4044.41.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

DOL Adv. Op. 2008-08A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

PBGC Annual Report (2008),
      http://www.pbgc.gov/docs/2008/annual_report.pdf. . . . . . . . . . . . . . . . . . . . . . . . 2, 25

Pension Protection Act of 2006,
      Pub. L. 109-280, § 107(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

44 Fed. Reg. 37221, 37225 (June 26, 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

S. Rep. No. 93-383 (1973),
      1974 U.S.C.C.A.N. 4639 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**INTRODUCTION**

The US Airline Pilots Association ("USAPA") seeks a preliminary injunction that would disrupt the operation of the federal government agency that insures pension benefits. USAPA asks the Court to appoint a "special trustee" to investigate and pursue potential claims regarding the terminated US Airways pilots' pension plan (the "Plan"), even though PBGC is already its trustee. The preliminary injunction must be denied for several reasons. As a threshold issue, even if USAPA could establish that the claims were meritorious, that their pursuit would likely be successfully litigated, and that there would be liable defendants with the ability to pay, by law the recoveries would not increase the benefits of USAPA's members. Thus, no irreparable harm can result from not appointing a special trustee. An injunction cannot issue absent irreparable harm.

Moreover, USAPA utterly fails to show a substantial likelihood of success on the merits to support this extraordinary relief. USAPA alleges that PBGC has failed to "investigate and rectify" purported fiduciary breaches allegedly committed by US Airways before the Plan terminated in 2003, even though USAPA raised most of these allegations with PBGC only eight weeks ago. In support, USAPA cites unspecified "allegations of fraud" that creditors asserted in US Airways' 2003 bankruptcy; "the relationship" between US Airways management and a certain management fund; and investment strategies that purportedly led to a shortfall in Plan assets. These vague allegations, some of which do not even involve the Plan, cannot establish that breaches were committed, that PBGC had a duty to − and unreasonably failed to − investigate them, and that USAPA's members have suffered damages as a result.

Finally, granting the requested injunction is hardly the benign step that USAPA describes. Apart from the disruption and cost that appointing a "special trustee" would cause in this particular case, such a ruling could expose the pension insurance program to pervasive

interference and substantial cost.  PBGC is invariably appointed statutory trustee of terminated,

underfunded pension plans, and broad, unsupported allegations like those involved here could be

asserted in many cases.  If a series of "special trustees" were appointed to investigate and pursue

such allegations, the agency's work would be seriously hampered, to say nothing of the substantial

costs involved.  For all of these reasons, the motion should be denied.

## STATUTORY BACKGROUND

PBGC is the wholly owned United States government corporation that administers the

nation's pension termination insurance program established by Title IV of ERISA.[1]  PBGC is

funded primarily by mandatory insurance premiums paid by employers that sponsor PBGC-

insured plans and by earnings on investments.[2]  When a pension plan covered by Title IV

terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes

responsible for, *inter alia*, collecting amounts due to the plan and to PBGC, and paying plan

participants and beneficiaries their pension benefits as determined in accordance with Title IV.[3]

PBGC serves its mission with respect to a terminated plan via a dual role – as statutory

trustee of the plan and as statutory guarantor of the benefits payable under the plan up to statutory

limits.[4]  The statutory trustee is "subject to the same duties" as a Chapter 7 bankruptcy trustee.[5]

---

[1]  *See* 29 U.S.C. § 1302; *see also PBGC v. LTV Corp.*, 496 U.S. 633, 636-37 (1990).

[2]  PBGC Annual Report (2008) at front inside cover, http://www.pbgc.gov/docs/2008/
annual_report.pdf.  PBGC's deficit as of April 2009 was $33.5 billion.  *See*
http://www.pbgc.gov/media/news-archive/news-releases/2009/pr09-30.html.

[3]  *See, e.g.,* 29 U.S.C. §§ 1321, 1322, 1342, 1344, 1361, and 1362.

[4]  *See Caskey v. PBGC*, No. 97-4240, 1999 U.S. DIST. LEXIS 21448, at *14 (E.D. Pa. Jan. 14,
1999), *aff'd mem.*, 203 F.3d 816 (3d Cir. 1999).

[5]  29 U.S.C. § 1342(d)(3).

A primary function of the trustee, like that of a Chapter 7 trustee, is to marshal a plan's assets,[6] a function that is substantially complete when the assets of a terminated plan are collected and pooled with the assets of other terminated plans.[7]  PBGC as guarantor has the power to, *inter alia*, conduct investigations and issue subpoenas on matters, such as potential claims, relevant to the agency's programs,[8] and is responsible for determining and paying benefits due to a plan's participants and beneficiaries, according to the rules set forth under Title IV.[9]

PBGC's dual role also extends to its claims for termination liability.  Upon plan termination, the plan's sponsor and its controlled group members become liable to PBGC, as guarantor, for the amount of the plan's unfunded benefit liabilities.[10]  Such liability is the shortfall between a plan's assets and its liabilities, measured according to PBGC termination assumptions.[11]  Furthermore, the plan's sponsor and its controlled group members become liable to PBGC, as statutory trustee, for the total amount of due and unpaid minimum funding contributions owed to a plan.[12]  As the statutory trustee for a terminated plan, PBGC may take

---

[6]  29 U.S.C. § 1342(d); *see* 11 U.S.C. § 704(a)(1).

[7]  *See* 29 U.S.C. § 1342(a) (providing PBGC, as guarantor, with authority to pool the assets of terminated plans).

[8]  29 U.S.C. § 1303(a)-(c).

[9]  29 U.S.C. §§ 1321, 1322, 1344, 1361.

[10]  29 U.S.C. § 1362(b).

[11]  *See* 29 U.S.C. § 1301(a)(18) (defining the "amount of unfunded benefit liabilities").

[12]  29 U.S.C. § 1362(c).  For plans that terminate in years 2008 and thereafter, the measure of liability under this section was changed to reflect changes to the funding rules under Title I of ERISA.  *See* Pension Protection Act of 2006, Pub. L. 109-280, § 107(b)(4).

actions that the plan administrator could have taken, such as collecting for the plan any amounts due the plan, and prosecuting any suit on behalf of the plan.[13]

Benefits paid by PBGC under a terminated plan pursuant to ERISA are of three types: (1) guaranteed benefits; (2) asset-funded benefits; and (3) section 1322(c) benefits.  Guaranteed benefits are paid by PBGC regardless of the plan's funded level and, subject to certain statutory limitations, include the payment of all nonforfeitable benefits[14] under the terms of a defined benefit plan at the time of plan termination.[15]  The applicable guarantee limitations include a cap on the amount of PBGC's guarantee[16] and a phase-in of its guarantee of benefit increases made during the five years before termination.[17]

Asset-funded benefits are additional benefits (beyond guaranteed benefits) that may be payable from a terminated plan's assets.[18]  The amount of asset-funded benefits depends on the plan's funded level and where the benefits fall in the six-tier hierarchy of the allocation scheme in 29 U.S.C. § 1344.[19]  PBGC determines the total amount of the assets of a terminated plan based on the fair market value of the assets as of the plan's termination date.[20]  Assets include any claims for unpaid minimum funding contributions and any claims for breaches of fiduciary

---

[13]  29 U.S.C. § 1342(d)(1)(B).

[14]  S*ee* 29 U.S.C. § 1301(a)(8) (defining "nonforfeitable benefit").

[15]  29 U.S.C. § 1322.

[16]  29 U.S.C. § 1322(b)(3).

[17]  29 U.S.C. § 1322(b)(1), (b)(7); *see* 29 C.F.R. §§ 4022.24-.25.

[18]  29 U.S.C. § 1344(a).  PBGC's regulations describe the sum of guaranteed benefits and asset-funded benefits as "Title IV benefits."  29 C.F.R. § 4001.2.

[19]  *See* 29 U.S.C. § 1344(a)(1) - (6); 29 C.F.R. §§ 4044.10-16.

[20]  29 U.S.C. § 1344(c); 29 C.F.R. § 4044.41.

duties.[21]  Once a plan's assets have been valued as of the plan termination date, "any increase or decrease in the value of the assets of a single-employer plan . . . shall be credited to, or suffered by, the corporation [*i.e.*, PBGC as guarantor]."[22]

A terminated plan's assets are allocated to benefits within the six "priority categories" of the section 1344 allocation scheme, starting with priority category 1 ("PC1"), and then moving to priority category 2 ("PC2"), and so on.[23]  Plan assets must be allocated to each category of benefits in succession, until all assets are exhausted, or all benefits in categories 1 through 6 are provided.[24]  Benefits in PC1 and PC2 are those benefits derived from a participant's own contributions to the plan.[25]  Benefits in PC3 (of which a portion may be non-guaranteed) are those benefits that a retiree was receiving as of three years before the plan's termination date, or that a non-retired participant could have received if he or she had retired three years before the termination date (but in either case limited to the lowest amount payable under the plan provisions in effect during the five years before the termination date).[26]  Benefits in PC4 are, with minor exceptions, all other PBGC-guaranteed benefits that are not in PC1 through PC3.[27]  Benefits in PC5 and PC6 are those that PBGC does not guarantee:  PC5 consists of all other nonforfeitable

---

[21]  29 U.S.C. §§ 1342(d)(1)(B)(ii), (iv); *see also* 29 U.S.C. § 1109(a).

[22]  *See* 29 U.S.C. § 1344(c); 29 C.F.R. §§ 4044.11-17.

[23]  *See* 29 U.S.C. § 1344(a)(1) - (6).

[24]  29 U.S.C. § 1344(a); 29 C.F.R. § 4044.10(d).

[25]  29 U.S.C. § 1344(a)(1) - (2).

[26]  29 U.S.C. § 1344(a)(3).

[27]  29 U.S.C. § 1344(a)(4).

(*i.e.*, vested) benefits under the plan, and PC6 all other (non-vested) benefits under the plan.[28] Thus, under the section 1344 allocation scheme, plan assets are allocated to guaranteed benefits in PC4 to reduce the expenditure from PBGC's insurance funds before they may be allocated to pay additional, nonguaranteed benefits in PC5 or PC6. As the Supreme Court has explained, the asset-allocation scheme thus "protects against evasion of the . . . limits on the [PBGC's] insurance benefits by use of pension fund assets to first pay uninsured benefits."[29]

Last, PBGC pays section 1322(c) benefits. Section 1322(c) provides that a plan's participants and beneficiaries will generally share a portion of PBGC's recoveries for its statutory claim relating to a plan's unfunded benefit liabilities.[30] These benefits are intended to cover a portion of participants' unfunded nonguaranteed benefits − *i.e.*, those benefits that are neither guaranteed by PBGC nor funded by the plan's assets.[31] Section 1322(c) benefits are allocated to those unfunded nonguaranteed benefits beginning in the section 1344 priority category where the plan's assets ran out. Unlike the allocation of a plan's assets under section 1344, no section 1322(c) amounts are allocated to guaranteed benefits − *i.e.*, the section 1322(c) allocation "skips over" guaranteed benefits in the priority categories.

### STATEMENT OF FACTS

US Airways was the sponsor of the Retirement Income Plan for Pilots of US Airways, Inc. (the "Plan"). Compl. ¶ 7. US Airways filed for Chapter 11 protection in August 2002. *Id.* at

---

[28] 29 U.S.C. § 1344(a)(5) - (6).

[29] *Mead Corp. v. Tilley*, 490 U.S. 714, 718 n.2 (1989), citing S. Rep. No. 93-383, p. 84 (1973), 1974 U.S.C.C.A.N. pp. 4639, 4968 (1973).

[30] 29 U.S.C. § 1322(c); *see also* 29 U.S.C. §§ 1362(b), 1363 and 1364.

[31] See 29 U.S.C. § 1301(a)(19), which defines the term "outstanding amount of benefit liabilities." PBGC usually uses "unfunded nonguaranteed benefits" because it is more descriptive.

¶ 10.  The Plan terminated with a termination date of March 31, 2003, and PBGC became its statutory trustee.  *Id.* at ¶ 17.  PBGC performed its established processes to review and value the Plan's assets, allocate them to Plan benefits as provided in ERISA and PBGC's regulations, and determine the resulting amount of Plan participants' statutory benefits (adding PBGC funds where necessary).[32]  PBGC determined that as of the Plan's termination date, it had assets of $1.19 billion and unfunded guaranteed benefits of $552 million.[33]  The total amount of unfunded benefit liabilities was $2.2 billion.[34]

US Airways pilots have brought three lawsuits in this Court regarding the Plan, each time seeking a preliminary injunction.  After PBGC began paying estimated benefits to Plan retirees, but before it issued final benefit determinations, a group of retired pilots filed the *Boivin* suit, seeking immediate adjustments to the estimated benefits.[35]  This Court denied the motion for preliminary injunction, and ultimately dismissed the suit for failure to exhaust administrative remedies.[36]  The dismissal was affirmed.[37]

---

[32]  *See* Plan Asset Audit, Exh. 6 to USAPA Mem. Supp. Prelim. Inj.; Declaration of Franklin Tate, Attachment A to this Opposition, at ¶¶ 5-7; Declaration of Rob Jones, Attachment B to this Opposition, at ¶¶ 12-14.

[33]  Declaration of Rob Jones, Attachment B to this Opposition, at ¶¶ 12, 15.

[34]  Declaration of Neela Ranade, Attachment C to this Opposition, at ¶ 5.

[35]  *Boivin v. US Airways, Inc.,* No. 03-2373 (JR) (D.D.C. filed Nov. 17, 2003).

[36]  297 F. Supp. 2d 110 (D.D.C. 2003) (denying preliminary injunction); 2005 WL 713622 (D.D.C. Mar. 17, 2005) (dismissing for failure to exhaust).

[37]  446 F.3d 148 (D.C. Cir. 2006).

Once PBGC issued benefit determinations, a number of pilots filed an administrative appeal with PBGC's Appeals Board.[38]  One of their allegations was that the Plan's prior fiduciaries (before the Plan terminated) had impermissibly transferred Plan assets to another US Airways plan.  *Id.* at 40.  On February 29, 2008, the PBGC Appeals Board issued its decision, addressing a variety of challenges.[39]  As to the pilots' asset-transfer allegation, the Appeals Board stated that it was beyond the scope of what the Appeals Board is authorized to review, but that it had referred the matter to PBGC's Office of General Counsel.  A group of 1,700 retired and retirement-eligible US Airways Pilots then filed the *Davis* suit (which USAPA has designated as a related case to the instant suit), challenging the Appeals Board's February 29, 2008 decision.[40]  The *Davis* plaintiffs also moved for a preliminary injunction, seeking to stop recoupment or recovery of benefit overpayments.  This Court denied that motion, and the D.C. Circuit affirmed.[41]  Meanwhile, PBGC's Office of General Counsel extensively investigated the asset transfer allegation, and the investigatory team recently reported on its findings to the General Counsel.[42]

On June 18, 2009, USAPA wrote to PBGC, alleging that "USAPA and its members suspect that before the [2002-03] bankruptcy proceeding and ensuing termination, the Plan's fiduciaries breached their duties by transferring assets out of the Plan and by making improper

---

[38]  The pilots' appeal letter is Exhibit C to the Second Amended Complaint in *Davis v. PBGC*, No. 1:08-cv-01064 (JR) (filed June 28, 2008), a related case to this case.

[39]  The PBGC Appeals Board's Feb. 29, 2008 decision is Exhibit A to the Second Amended Complaint in *Davis, supra* n.38.

[40]  *Davis v. PBGC*, No. 1:08-cv-01064 (JR).

[41]  596 F. Supp. 2d 1 (D.D.C. 2008), *aff'd*, 573 F.3d 1288 (D.C. Cir. 2009), *pet. for rehearing filed*, No. 08-5224 (D.C. Cir. Aug. 24, 2009).

[42]  *See* Declaration of Nicole Hagan, Attachment D to this Opposition.

investments."[43]  Responding to the June 18 letter, PBGC requested more specific information and documentation.[44]  On July 17, 2009, USAPA replied, identifying six "suspicious occurrences, investments and transactions."[45]  Those "suspicious occurrences, investments and transactions" form the basis for USAPA's current lawsuit and motion for preliminary injunction − each of which seek the appointment of a "special trustee" to investigate and pursue potential claims for fiduciary breach.

## STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary and drastic remedy" that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."[46]  The moving party must show:  (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction.[47]  Any injunction that a court issues must be carefully circumscribed and "narrowly tailored to remedy the harm shown."[48]

We demonstrate below that USAPA falls far short of the showing needed for any preliminary injunction.  Moreover, where, as here, the preliminary relief would change the status

---

[43]  Exhibit 3 to USAPA Mem. Supp. Prelim. Inj., Letter from D. Butler to V. Snowbarger (Jun. 18, 2009), at 1.

[44]  Exhibit 4 to USAPA Mem. Supp. Prelim. Inj., Letter from J. Starr to D. Butler (Jul. 9, 2009).

[45]  Exhibit 5 to USAPA Mem. Supp. Prelim. Inj., Letter from D. Butler to N. Hagan (July 17, 2009), at 3.

[46]  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

[47]  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

[48]  *NTEU v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990).

quo – appointing a special trustee to take over some of PBGC's functions as statutory trustee – the motion seeks a mandatory injunction.[49]  Mandatory injunctions generally require the moving party to meet an even higher standard than it would for an ordinary preliminary injunction.  The movant must show "clearly" that it is entitled to relief or that extreme or very serious damage will result.[50]  While the D.C. Circuit has not expressly adopted or rejected this higher standard for mandatory injunctions,[51] several district courts within this circuit have adopted it.[52]  In the case of a mandatory injunction against a government agency, this Court itself has granted such relief where the facts were egregious, but acknowledged that a "mandatory injunction is an extraordinary remedy, especially when directed at the United States Government."[53]

USAPA's motion particularly warrants this heightened scrutiny because the relief it seeks is extraordinary.  Replacement of an ongoing ERISA plan trustee – as distinguished from other remedies to correct neglect or malfeasance – is exceptional.  Supplanting or supplementing a plan

---

[49]  *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996).

[50]  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) ("[where] a party seeks mandatory preliminary relief that goes well beyond maintaining the *status quo pendente lite*, courts should be extremely cautious about issuing a preliminary injunction"); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025-26 (2d Cir. 1985) (same); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (same).

[51]  *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 834 n.31 (D.C. Cir. 1984) ("[i]n this circuit, however, no case seems to squarely require a heightened showing, and we express no view as to whether a heightened showing should in fact be required"); *see also Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 159 F.3d 636 (D.C. Cir. 1998) (unpublished table decision) (declining to "reach the question whether the district court erred in holding that the standard applicable to a mandatory preliminary injunction is higher than that applicable to a prohibitory preliminary injunction").

[52]  *See Adair v. England*, 217 F. Supp. 2d 1, 3 n.6 (D.D.C. 2002); *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 151 (D.D.C. 2002); *Elite Entm't, Inc. v. Reshammiya*, Case No. 08-0641, 2008 U.S. Dist. LEXIS 31580, *11-12 (D.D.C. Apr. 18, 2008) (the nature of relief sought, *i.e.*, mandatory injunction, is a "relevant fact bearing on the equities of the case").

[53]  *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005).

fiduciary with a "special trustee" is certainly not the "usual course."[54]  But where PBGC is statutory trustee of a terminated plan, such relief would be unprecedented.

## ARGUMENT

### I.    USAPA MEMBERS WILL NOT SUFFER IRREPARABLE HARM ABSENT THE INJUNCTION THEY SEEK.

USAPA alleges that it "will be irreparably harmed if a temporary trustee is not appointed immediately to begin investigating potential claims against former trustees of the Plan."  USAPA Mem. at 17.  It asserts that "[t]he lives and health of USAPA's members, as beneficiaries of the Plan," will be "irreparably injured," as "USAPA members depend on their retirement income to survive."  *Id*. at 18.  Of course, most working people depend on their retirement income.  But, as explained below, the "potential claims" that USAPA describes – even if they were meritorious and successfully pursued – would *not* increase the pilots' pension benefits.  Accordingly, there is no harm to USAPA, much less irreparable harm, based on whether these amorphous claims are pursued.

Even if PBGC (or a "special trustee") investigated, pursued, and recovered funds based on USAPA's allegations, the pilots' statutory benefits would not increase.  After a plan terminates, PBGC values and allocates the plan's assets as of its termination date in order to determine participants' statutory benefits.  PBGC has done that here.  Any gains or losses on plan assets subsequent to plan termination accrue to, or are suffered by, PBGC on behalf of all stakeholders in the national pension insurance system.[55]

---

[54]  *Chao v. Malkani*, 452 F.3d 290, 294 (4th Cir. 2006) (even when a breach is committed by a fiduciary, "[r]emoval is, however, not the usual course").

[55]  29 U.S.C. § 1344(c) provides, in relevant part:  "Any increase or decrease in the value of the assets of a single-employer plan occurring after the date on which the plan is terminated shall be credited to, or suffered by, the corporation [PBGC]."

And even if an unusual and unexpected fiduciary breach recovery led PBGC to redo its valuation and allocation in this case,[56] the pilots' statutory benefits could increase only if the recovery for such a breach exceeded *half a billion dollars*. This is because there are assets in the Plan sufficient to pay all benefits through statutory priority category 3, but not through priority category 4 (PBGC-guaranteed benefits).[57] Thus, if PBGC (or a "special trustee") recovered any additional assets, they would go first to PBGC to help offset the guaranteed benefits in priority category 4 that PBGC is already paying. Participants could benefit from that recovery only if the monies were sufficient to pay all priority category 4 benefits and some or all of the benefits in priority category 5. That would require recovery of more than $510 million. *Id.* at ¶ 15. Since that is unimaginable under any scenario, there is no harm to USAPA based on its allegations.

## II.    USAPA HAS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    PBGC's actions have been thoroughly prudent and reasonable.

The gravamen of USAPA's complaint is that PBGC has "refused" or "failed" to conduct a reasonable investigation of possible wrongdoing by the former Plan trustees. To the contrary, PBGC's procedures for taking over the assets of a terminated plan include significant steps to detect irregular transactions by the former trustees, and PBGC acts upon specific allegations of wrongdoing that are subsequently brought to its attention.

Every incoming pension plan trusteed by PBGC is subject to a detailed plan asset audit. The Operations Manual of PBGC's Benefit Administration and Payment Department effective when PBGC became trustee of the Plan contains procedures to identify potential instances of

---

[56] *See* Declaration of Rob Jones, Attachment B to this Opposition, at ¶ 11 (PBGC may revise the valuation of plan assets in rare cases involving a material mistake of fact or an extraordinary change of circumstances).

[57] *See* Declaration of Rob Jones, Attachment B to this Opposition, at ¶¶ 14, 15.

fraud, fiduciary breach, and party-in-interest transactions.  In particular, the auditor is directed to

take the following actions:

13      Determine whether people other than the named fiduciaries were handling
        investments.  The plan portfolio of investments could be administered by
        only those people authorized by the trust instrument.  If this has not been
        the case, expand the audit to review for any breach of fiduciary
        responsibility.  Consult with [the Office of General Counsel] if required.

14      Review any transactions that do not appear to be "arms-length," such as
        buyer and seller having vested interests, and which should have affected the
        value of assets sold.  Where there is a relationship between buyer and seller
        (also called "parties at interest"), it must be demonstrated that the price is
        substantially the same as would have resulted from a strictly arms-length
        transaction.  If this has not been the case, determine whether there has been
        any breach of fiduciary responsibility.  Consult with [the Office of General
        Counsel] if required.[58]

Thus, PBGC auditors were required to look for evidence of unauthorized activity or suspicious

dealings, and to consult if necessary with legal counsel.  These procedures were carried out here.

PBGC's plan asset audit, dated January 11, 2006, concludes:  "Based on the review of the

available statement of accounts, there was no improper transfer from the accounts."[59]  The audit

report received appropriate supervisory concurrence.  This is a government record entitled to a

presumption of regularity.

        PBGC also used a process to review and value the Plan's investments over and above the

plan-asset audit.  At the time PBGC took over the Plan, PBGC's Financial Operations Department

had a special unit to provide technical advice on matters involving plan-asset valuation, allocation,

---

[58]  *See* Attachment E to this Opposition, Benefit Administration and Payment Department,
Operations Manual § 15.1 (effective Feb. 16, 2001).

[59]  Plan-asset audit, Exhibit 6 to USAPA Mem. Supp.  Prelim. Inj.

control, liquidation, and transfer.[60]  Because this was a large and complex plan, PBGC hired an

outside consultant, Pacholder Associates, Inc. (now JPMorgan Investment Management Inc.),

*inter alia*, to conduct an independent valuation of certain illiquid or hard-to-value assets.  One of

those assets involved an investment involving Alchemy Partners that USAPA cites as an example

of a possible breach.  Pacholder's valuation report shows that PBGC acted prudently with regard

to such assets, undermining USAPA's claim that it is likely to succeed on the merits.

Notwithstanding the findings of the plan-asset audit and the supplemental review by

Pacholder, when a group of Plan participants raised with PBGC's Appeals Board on March 23,

2007, allegations of improper transfers from the Plan to another US Airways benefit plan, PBGC's

Office of the General Counsel opened a special investigation.[61]  As PBGC's General Counsel

explained to USAPA:

> PBGC takes allegations of misconduct by former Plan fiduciaries very seriously.
> PBGC has been investigating the prior allegations by US Airways pilots that there
> were improper transfers from the Plan to other plans sponsored by US Airways.
> This investigation has been hampered by the fact that the allegations were not
> specific and that no documentation in support of these allegations was produced or
> even identified.  Nonetheless, we have been diligently investigating to determine if
> there is any support for these allegations.[62]

As set forth in the Declaration of Nicole Hagan, PBGC's investigative team extensively

examined these asset-transfer allegations, and recently reported its findings to PBGC's General

Counsel (on September 2, 2009).[63]  Ms. Hagan, an attorney in the Office of the General Counsel,

---

[60]  Declaration of Franklin Tate, Attachment A to this Opposition, at ¶¶ 1-2 (the Financial
Operations Department is now called the Corporate Investments Department).

[61]  Declaration of Nicole Hagan, Attachment D to this Opposition, at ¶¶ 3-5.

[62]  Exhibit 4 to USAPA Mem. Supp. Prelim. Inj., Letter from J. Starr to D. Butler (Jul. 9, 2009), at
1.

[63]  Declaration of Nicole Hagan, Attachment D to this Opposition, at ¶¶ 3-6.

is a former investigator for the Department of Labor. There she oversaw major fiduciary breach investigations at that agency's Employee Benefits Security Division.[64] Although the conclusions of the investigation are not ready for public release as they are under review by PBGC senior staff, Ms. Hagan's declaration rebuts USAPA's charge of indifference and inaction on the part of PBGC.

In a letter dated June 18, 2009, USAPA submitted to PBGC for the first time written allegations of two other types of purported misconduct by the former Plan trustees. USAPA asserted that the former trustees "pursued investments that may have involved self-dealing and conflicts of interest, and pursued questionable investment strategies for long-term pension plans" and "failed to take the necessary steps to protect the Plan even as its investments were losing value."[65] Despite the vagueness of these allegations, PBGC's General Counsel furnished USAPA a list of the specific information that would aid PBGC in investigating effectively. Ms. Starr further promised USAPA: "If you will provide this information to my staff, we will promptly review it." Given that USAPA made its allegations of self-dealing, questionable investment strategies, and failure to protect investments to PBGC for the first time in summer 2009, PBGC cannot reasonably be expected to have already finished its review of those accusations. This is especially so, given the paucity of detail that USAPA provided to PBGC even in its second letter dated July 17, 2009.[66]

Finally, to the extent that USAPA implies a breach based on a failure to disclose, USAPA fails to show that it is entitled to the information it seeks about PBGC's investigation of possible

---

[64]  *Id.* at ¶ 2.

[65]  Exhibit 3 to USAPA Mem. Supp. Prelim. Inj., Letter from D. Butler to V. Snowbarger (Jun. 18, 2009), at 1.

[66]  Exhibit 5 to USAPA Mem. Supp. Prelim. Inj., Letter from D. Butler to N. Hagan (Jul. 17, 2009).

misconduct by the Plan's former fiduciaries.  PBGC has already responded to requests from

USAPA and others under the Freedom of Information Act.  FOIA contains an express exemption

permitting an agency to protect from disclosure records or information compiled for civil or

criminal law enforcement purposes.  5 U.S.C. § 552(b)(7).  If USAPA feels aggrieved by PBGC's

response, its remedy is to seek judicial relief under FOIA.  Instead, USAPA attempts to bypass

those remedies by citing 29 U.S.C. § 1342(d)(3) and 11 U.S.C. § 704(a).  USAPA argues that

"PBGC is obligated to provide such information to USAPA and its members," but provides only

the most cursory analysis of those provisions.  In particular, USAPA fails to explain how a

Chapter 7 trustee's duty to make periodic reports to the bankruptcy court about the debtor's

financial affairs translates into a requirement under ERISA for PBGC to respond immediately to

written "demands" by a union or plan participants for details about ongoing investigations.

Moreover, USAPA's extremely broad request would infringe upon the privileges for deliberative

process, attorney-client communications, and attorney work product.

To summarize, PBGC's ordinary processes of taking over assets of terminated plans

provide effective mechanisms for detecting suspicious activities or transactions.  In this case,

PBGC also hired an outside expert to conduct an independent evaluation of the Plan's unusual

assets.  After PBGC received written allegations of wrongdoing by the former trustees – made in

2007 about improper transfers between plans and expanded in 2009 to include self-dealing,

questionable investment strategies, and failure to protect investments – PBGC responded

appropriately.  USAPA falls woefully short of showing that PBGC has failed to conduct a prudent

and reasonable investigation to date.

**B.    USAPA has not shown that there is likely a meritorious claim against the former Plan fiduciaries.**

In its letter of June 18, 2009, alleging improper transfers, self-dealing, questionable investment strategies, and failure to protect investments, USAPA asserted that "[t]hese actions resulted in the $2 billion funding shortfall that precipitated the Plan's distress termination."[67]  This assertion that the Plan's funding shortfall at termination was proximately caused by any conduct of the former fiduciaries is unsupported and highly dubious.  USAPA cites the Declaration of Michael Cleary, which asserts:  "As of December 31, 2000, US Airways' filings with the U.S. Securities and Exchange Commission showed that the Plan was almost fully funded."[68]  Although USAPA does not identify the specific SEC filing, attach a copy, or include quotations to support this statement, Mr. Cleary apparently refers to US Airways' Form 10-K annual report for the fiscal year ended December 31, 2000.[69]  But this form consolidates data from *all* of US Airways' defined benefit plans, not just the Plan.  It shows only that the US Airways plans – in the *aggregate* – were underfunded by about $300 million.  However, the Plan's actuarial valuation report shows that the Plan accounted for about $180 million of that $300 million of underfunding.[70]

---

[67]  Exhibit 3 to USAPA Mem. Supp. Prelim. Inj., Letter from D. Butler to V. Snowbarger (Jun. 18, 2009).

[68]  Exhibit 1 to USAPA Mem. Supp. Prelim. Inj., Declaration of Michael Cleary at ¶ 6 (Sept. 2, 2009).

[69]  Excerpts of US Airways' Form 10-K, Attachment F to this Opposition.

[70]  Declaration of Neela Ranade, Attachment C to this Opposition, at ¶ 7.

There are many other problems with USAPA's allegation that breaches by the former Plan fiduciaries caused the Plan $2 billion of losses. These problems are described in the Declaration of Neela Ranade, a senior PBGC actuary (Attachment C to this Opposition):

- *The different measures of liability.* The measure of liability used by PBGC to determine underfunding as of a plan's termination date is entirely different from the accounting measure used by companies in their SEC filings. Underfunding on a termination basis is typically much greater than underfunding on an SEC-filing basis. PBGC estimates that the Plan's underfunding, on a termination basis, was about $580 million as of December 31, 2000.[71]

- *The decline in interest rates.* Pension liabilities are highly sensitive to changes in interest rates, and move inversely from those rates – *i.e.*, a decrease in interest rates increases pension liabilities (and vice versa). The rates PBGC uses to determine termination underfunding declined by almost two percent from the end of 2000 to March 2003. PBGC's actuary estimates that this decline increased the Plan's termination underfunding by about $630 million over this period.[72]

- *Additional benefit accruals.* US Airways employees continued to earn additional benefits during the period December 31, 2000, to March 31, 2003. These additional benefits increased the Plan's liabilities by about $410 million, measured on a termination basis.[73]

- *The decline in stock values.* Equity investments declined sharply in value between the end of 2000 and early 2003. The S&P 500 stock index declined by 34% and the MSCI EAFE index (a similar index for international stocks) by 39% during this period. Although PBGC cannot precisely quantify the losses due to this factor because information on the Plan's asset mix at the end of 2000 is not readily available, PBGC's actuary estimates that the Plan would have lost about $170 million – and Plan underfunding would thus have increased by $170 million (on a termination basis) – if the Plan's asset mix was similar to the typical asset mix of other large plans at that time.[74]

Thus, even if USAPA could prove a $2 billion increase in Plan underfunding during this period (which it has not), there are many plausible explanations other than misconduct by the

---

[71]  *Id.* at ¶ 10.

[72]  *Id.* at ¶ 12.

[73]  *Id.* at ¶ 13.

[74]  *Id.* at ¶ 14.

former fiduciaries.  Indeed, in 2003 testimony before Congress, PBGC's then-Executive Director used this Plan as an example of a sudden, sharp decline in a plan's funded status that "shocked" participants, but is a predictable result of various factors in the pension system, including weaknesses in the funding rules, different measures of pension liability, and the lack of adequate disclosure requirements about plans' funded status.[75]

Similarly, if one looks only at the Plan's assets, they decreased by about $670 million from the end of 2000 to the March 31, 2003 termination date (from $1.86 billion to $1.19 billion). Most of that $670 million decrease may be easily explained without engaging in detailed analysis. As shown above, about $170 million of the decrease can likely be explained by the general decline in stock values during this period.  In addition, another $310 million of the decrease is explained by the simple fact that US Airways paid out about $310 million in benefits during this time while making no contributions to the Plan.[76]  Thus, even assuming for the sake of argument that the Plan suffered *some* losses due to fiduciary breach by the former trustees, it is extremely improbable that those losses could have been large enough to have affected participants' PBGC benefits.  This is because, as shown above, the Plan would have needed an additional half billion dollars of assets to provide increased Title IV benefits to participants.

USAPA also contends that the losses on certain investments the Plan held are strong evidence of fiduciary breach.  Its letter of July 17, 2009, USAPA labeled as "suspicious occurrences, investments, or transactions" the following:

---

[75]  *See* Testimony of former PBGC Executive Director Steven A. Kandarian before the Senate Special Committee on Aging, October 14, 2003, Attachment G to this Opposition, at 9. Mr. Kandarian testified that shortly before termination, the Plan had reported that it was 94% funded on a "current liability basis" (yet another measure used to determine a plan's legally required funding contributions), but that at termination it was only 35% funded on a "termination basis."

[76]  Declaration of Neela Ranade, Attachment C to this Opposition, at ¶ 15.

3)      the decisions of the Plan to invest in such stocks as Arigate PCS Inc., Alkermes Inc., BearingPoint Inc., Check Point Software, Elam PLC, Human Genome Sciences, Internet SEC Sys, Inc., and JDS Uniphrase Corp., without taking steps to protect the Plan as these stocks lost most if not all of their value over a very short period of time;

4)      the investment strategies and decisions of several investment managers of the Plan -- particularly those who lost significant portions of the investment dollars they where [sic] managing -- to determine whether the strategies pursued were consistent with the investment guidelines of the Plan;

5)      the decision of the Plan to invest in Alchemy Partners (Air) LLP or Alchemy Partners (Guerney) Limited; . . . .

While a pension plan's assets must be prudently invested and properly diversified, USAPA does not come close to showing that the Plan has a meritorious claim against its former trustees for fiduciary breach. USAPA cannot rely on hindsight to second-guess decisions to make specific investments, but must look at information that was available at the time.[77]

As the Department of Labor made clear in the preamble to its "investment duties" regulation, no particular investment or investment course of action is *per se* imprudent under ERISA.[78] Thus, ERISA's prudence requirement "focuses on a fiduciary's conduct in arriving at

---

[77] *See Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997) ("[p]rudence is evaluated at the time of the investment without the benefit of hindsight."); *De Bruyne v. Equitable Life Assurance Sec.*, 720 F. Supp. 1342, 1349 (N.D. Ill. 1989), *aff'd*, 920 F.2d 457 (7th Cir. 1990) ("fiduciary duty of care requires prudence, not prescience"); *Donovan v. Walton*, 609 F. Supp. 1221, 1228 (S.D. Fla. 1985) ("[a] court's task is to inquire whether the trustees, at the time they engaged in the challenged transaction, employed the appropriate methods . . . . The analysis considers the trustees' conduct and not . . . success or failure of the investment"), *aff'd sub nom.* 794 F.2d 586 (11th Cir. 1986).

[78] *See* Preamble to Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets under the "Prudence Rule":

The Department is of the opinion that (1) generally, the relative riskiness of a specific investment or investment course of action does not render such investment or investment course of action either *per se* imprudent or *per se* imprudent, and (2) the prudence of an investment decision should not be judged without regard to the role that the proposed investment or investment course of action plays within the overall plan portfolio. Thus, although securities issued by a small or new

20

an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."[79]  Even if, as USAPA alleges, certain stocks "lost most if not all of their value" or certain investment managers "may have lost significant portions of the investment dollars they were managing," this does not, in and of itself, constitute a violation of ERISA's fiduciary provisions.  Indeed, it is safe to say that many prudent investors saw individual stocks decline a great deal during that time.

USAPA also cites unspecified "allegations of fraud" that creditors asserted in US Airways' 2002-03 bankruptcy, but gives no particulars.  Whether these allegations of fraud had to do with the Plan, or merely with creditors of the US Airways' estate, is not explained.  USAPA also asserts as suspicious "the relationship" between US Airways management and a certain management fund.  But again it supplies no details.  These vague allegations do not establish the probability of any breach, and certainly do not justify appointment of a special trustee simply because PBGC may not have pursued such amorphous allegations.

Finally, even giving USAPA the benefit of the doubt about the possibility of a valid claim for misconduct against one or more former fiduciaries, USAPA presents absolutely no evidence on the likelihood of collection.  USAPA never identifies the specific individuals or corporations that may be liable, and certainly provides no evidence of their ability to pay a judgment.  In order to justify the extraordinary remedy of displacing PBGC from its normal role as statutory trustee

---

company may be a riskier investment than securities issued by a "blue chip" company, the investment in the former company may be entirely proper under the Act's "prudence" rule.

44 Fed. Reg. 37221, 37222 (June 26, 1979).  *See also* DOL Adv. Op. 2006-08A (Oct. 3, 2006) ("[w]ithin the framework of ERISA's prudence, exclusive purpose and diversification requirements, the Department believes that plan fiduciaries have broad discretion in developing investment strategies appropriate to their plans").

[79]  *In re Unisys Corp.*, 173 F.3d 145, 153 (3d Cir. 1999) (internal quotations and citation omitted).

and appointing a special trustee to pursue litigation against potential defendants, USAPA must, at minimum, present at least *some* evidence that recovery is more than theoretically possible. USAPA has not done so.

In summary, USAPA has failed to justify its conclusion that the Plan's underfunding at termination was proximately caused by misconduct of the former fiduciaries. Its inferences drawn from pension funding data are dubious. It has furnished only irrelevant hindsight evidence that any specific investments or investment strategies were imprudent. It has presented no evidence at all on the probability of collection. In short, it has fallen far short of showing the likelihood of a meritorious claim against the former fiduciaries.

**C.    USAPA has shown no harm to participants caused by PBGC's purported failure to pursue former Plan fiduciaries.**

USAPA posits that PBGC has failed to investigate "even the possibility of recovering additional funds for the Plan." USAPA's argument seems to assume that any successful recovery of funds based on the Plan's potential claims against former trustees would automatically increase participants' benefits. But as shown in PBGC's discussion of irreparable harm above, this is not the case, as recovery of more than half a billion dollars would be necessary for participants' benefits to be affected.[80] Absent a showing of harm caused by PBGC's purported breach, USAPA cannot prove an element of its claim.

---

[80]  Because any recovery against former trustees up to half a billion dollars would redound to the benefit of PBGC and its premium payers, not the participants, PBGC already has a strong financial incentive to pursue any meritorious claim against the wrongdoers. Given PBGC's serious deficit, PBGC's interest in reducing its insurance program losses gives it ample reason to prosecute any worthy cause of action. USAPA's own brief cites two historical examples of PBGC's fiduciary breach litigation. *See PBGC v. Beverly*, 404 F.3d 243, 249 (4th Cir. 2005); *PBGC v. BankOne, N.A.*, 34 F. Supp. 2d 608 (S.D. Ohio 1998). A more recent example is PBGC's complaint in *PBGC v. Farley*, No. 08-CV-2529 (N.D. Ill. filed May 2, 2008).

### D. PBGC's asserted inaction in pursuing an alleged fiduciary breach is presumptively unreviewable.

USAPA cannot prevail on a claim against PBGC for failure to pursue alleged fiduciary breaches because PBGC's alleged failure to act is presumptively unreviewable. USAPA's claims that PBGC failed in its alleged duties to investigate and remedy are strikingly similar to the participants' claims in *Paulsen v. CNF Inc.*[81] There, the Ninth Circuit held that PBGC's discretionary decision not to pursue fiduciary breach claims is not subject to judicial review, relying on *Heckler v. Chaney*, 470 U.S. 821 (1985). Because USAPA cannot distinguish *Paulsen,* where the plaintiffs alleged that PBGC breached its fiduciary duties by choosing not to pursue claims against the fiduciary defendants, USAPA argues that the Ninth Circuit was simply wrong. Their argument is unconvincing.

In *Paulsen*, the Ninth Circuit explained the rationale for unreviewability, quoting *Heckler*:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.[82]

Addressing the argument that *Heckler* should not apply when PBGC acts in its statutory trustee role – which USAPA makes here – *Paulsen* flatly rejected it:

> When PBGC is acting as trustee to a distress terminated plan, it "has the power . . . to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan." 29 U.S.C. § 1342(d)(1)(B)(iv). Nothing in ERISA expressly compels PBGC to pursue claims on the terminated plan's behalf . . . .

---

[81]  559 F.3d 1061 (9th Cir. 2009).

[82]  559 F.3d at 1085 (quoting 470 U.S. at 831-32).

> PBGC's decision regarding whether to sue on behalf of a plan involves the "complicated balancing" of all five factors identified in *Heckler*. PBGC must evaluate whether an ERISA violation has occurred, whether its limited resources are best spent on pursuing claims based on one violation or another, whether it is likely to succeed if it acts, whether the particular lawsuit best fits the agency's overall policies, and whether it has enough resources to undertake the action at all.

559 F.3d at 1086-87. The Court concluded that nothing in ERISA rebuts the presumption of unreviewability. *Id.* at 1088.

USAPA argues that the Ninth Circuit's holding should not be followed in this Circuit. In the related *Davis* case, however – another challenge by US Airways pilots that also involved deference to PBGC's actions as a trustee – the D.C. Circuit rejected the notion that PBGC's status as statutory trustee should affect the deference due: "We see no reason to depart from the usual deference we give to an agency interpreting its organic statute. . . . Unlike a private trustee, the PBGC has unique experience and 'practical agency expertise' in interpreting ERISA . . . and it is for this reason we defer to the PBGC's authoritative and reasonable interpretations."[83]

Thus, whether it is *Heckler* deference to an agency's decision not to act, or *Chevron* deference to an agency's statutory interpretations, recent circuit court cases hold that there is no basis to give PBGC less deference when it acts as statutory trustee. Given this case law alone, USAPA cannot establish a likelihood of success on the merits.

---

[83]  *Davis v. PBGC*, 571 F.3d 1288, 1293 (D.C. Cir. 2009).

### III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR PBGC.

USAPA asserts that appointing a special trustee to investigate and pursue its allegations would cause PBGC no harm.  USAPA goes so far as to say that PBGC actually might be "relieved" at this result.[84]  Nothing could be further from the truth.

Even for an ongoing plan, "[t]he appointment of a receiver [*i.e.*, special or temporary trustee] is a harsh remedy, not to be imposed without a showing of necessity."[85]  This remedy is "drastic," and certainly "not the usual course," because it necessarily involves "disruption and expense."[86]  USAPA completely ignores the discontinuity to PBGC's operations that would result if a special trustee were appointed.  Disturbing the operations of an agency that in 2008 paid nearly $4.3 billion in benefits to more than 640,000 people under 3,860 terminated pension plans should not be undertaken lightly.[87]  Similarly, USAPA is completely silent on the "significant costs" involved in appointing a special trustee to chase down vague and unsupported allegations.[88]  Indeed, even when courts have imposed the "drastic remedy" of removing a private-sector trustee or appointing a special trustee or receiver, they have traditionally done so only after evidence established that the supplanted fiduciaries engaged in "egregious" malfeasance, usually involving

---

[84]  USAPA Mem. Supp. Prelim. Inj. at 19.

[85]  *Donovan v. Bierwirth*, 680 F.2d 263, 276 (2d Cir. 1982).

[86]  *Chao v. Malkani*, 452 F.3d at 294 ("removal can be detrimental for plan participants and employers alike.  It imposes significant costs on plans, which must undergo an inevitable period of transition as a new fiduciary familiarizes itself with the plan's provisions. Constant turnover can also disrupt plan administration, and might cause delay in participants receiving vital benefits"); *Bierwirth*, 680 F.2d at 277.

[87]  *See* PBGC Annual Report (2008) at 2, http://www.pbgc.gov/docs/2008/annual_report.pdf.

[88]  *Malkani*, 452 F.3d at 294.

self-dealing or prohibited transactions.[89]  In this case, we have only USAPA's vague assertions of PBGC's purported nonfeasance.  USAPA must demonstrate much more to the Court to justify the unprecedented remedy sought here, *i.e.*, appointment of a special trustee charged with investigating matters that have been or will be addressed by a federal agency.

Nor is the public interest served by the appointment of a special trustee.  Such a ruling could expose the pension insurance program to widespread second-guessing.  Participants of underfunded plans are often understandably anxious in the wake of a termination.  Those worries may be fed by fears and rumors circulating during an employer's bankruptcy.  Because PBGC is invariably appointed statutory trustee of terminated plans, granting relief on such a weak showing could lead to copycat allegations in many cases.  Lawsuits to "investigate the investigators" would proliferate, and the agency's work, and therefore the public interest, would be seriously hampered.

For these reasons, both the balance of equities and the public interest also militate against a preliminary injunction.

---

[89]  *See Chao v. Malkani*, 452 F.3d at 294 (affirming removal of fiduciaries upon finding of "repeated efforts to plunder the Plan's assets"); *Reich v. Lancaster*, 55 F.3d 1034 (5th Cir. 1995) (affirming removal of fiduciaries for significant prohibited transactions, after two-week bench trial); *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir.1991) (affirming removal of trustee because of "massive" and "egregious self-dealing"); *Katsaros v. Cody*, 744 F.2d 270 (2d Cir. 1984) (affirming appointment of temporary investment manager after lower court found that former trustees invested 60% of plan's assets, $20 million, via a personal loan); *Marshall v. Snyder*, 572 F.2d 894, 897, 899, 901 (2d Cir. 1978) (affirming appointment of temporary receiver after district court found "inescapable evidence" that fiduciaries violated consent order by engaging in continued self-dealing with plan assets).

## CONCLUSION

For the foregoing reasons, USAPA's motion for a preliminary injunction should be denied.


September 11, 2009                              Respectfully submitted,


                                               /s/ Joseph M. Krettek

Office of the General Counsel          Office of the Chief Counsel
JUDITH R. STARR                        ISRAEL GOLDOWITZ
General Counsel                        Chief Counsel
PHILIP R. HERTZ                        CHARLES L. FINKE
Deputy General Counsel                 Deputy Chief Counsel
KENNETH J. COOPER                      JAMES J. ARMBRUSTER
Assistant General Counsel              PAULA J. CONNELLY
JOSEPH J. SHELTON                      GARTH D. WILSON
Special Counsel                        Assistant Chief Counsels
DHARMESH S. VASHEE                     JEAN MARIE BREEN
Attorney                               JOSEPH M. KRETTEK
                                       MICHAEL A. MARICCO
                                       Attorneys

          PENSION BENEFIT GUARANTY CORPORATION
          1200 K Street, N.W.
          Washington, D.C.  20005-4026
          Telephone:  (202) 326-4020 ext. 6772
          Facsimile:  (202) 326-4112

          Attorneys for Defendant PBGC